[Civ. No. 24863. Second Dist., Div. One. May 24, 1961.]

CORENE McNEILL et al., Respondents, v. ESTELLE BREDBERG, Appellant.

459

Scudder & Forde and M. W. Young for Appellant.

F. Walter French and Joseph P. Argenta for Respondents.

WOOD, P. J.—On May 27, 1958, Mrs. Estelle Bredberg and Mrs. Corene McNeill signed escrow instructions whereby Mrs. Bredberg agreed to sell and Mrs. McNeill agreed to buy a house and lot.

The escrow has not been closed. Within a few weeks after the instructions were signed, the defendant went to Europe but prior to leaving for that trip she authorized Mrs. McNeill to move into the house. Soon after receiving such authoriza-

tion, Mrs. McNeill moved into and took possession of the house, and she has resided there since that time.

In August 1958, Mrs. McNeill married Mr. Griffin, who is a plaintiff herein. He also lives in the house referred to herein. While the Griffins were in possession of the property they constructed two retaining walls and a patio on the property, installed drainage tile, repaired cracks in the walls of the house, and made other improvements on the property.

In November 1958, Mrs. Bredberg returned from Europe. She married Mr. Jumper in November.

On December 4, 1958, plaintiff Mrs. Griffin sent a notice to defendant (Mrs. Estelle Bredberg Jumper) stating that she rescinded the escrow agreement of May 27, 1958, for the reason, among others, that defendant had misrepresented the condition of the property. The notice also stated that she (buyer) offered to restore everything of value which she had received from defendant, upon condition that defendant return $4,760 "or more" which was paid into escrow and that defendant reimburse her (buyer) in the amount of $4,707 representing the cost of materials and labor in constructing a retaining wall at the rear of the property.

This action was commenced on January 26, 1959.

The first cause of action herein was for rescission of the escrow agreement on the ground of fraud, or, in the alternative, for damages for fraud in inducing plaintiffs to purchase the property. The second cause of action was for money had and received. The "Joint Pre-Trial Statement" recited that, if rescission cannot be granted, an issue to be decided will be whether plaintiffs are "entitled to a judgment directing defendant to execute and deliver a deed to the property in favor of plaintiffs." The pretrial order included said recital of the joint statement.

The judgment provided as follows: Plaintiffs "are entitled to judgment" against defendant for $7,565 and costs. Plaintiffs are ordered and directed to comply with the escrow agreement (except the amendment of August 15) after they have been given credit by defendant for said $7,565. Defendant is ordered and directed to extend a credit of $7,565 and costs of suit to plaintiffs toward the purchase price of the property; and defendant is ordered and directed to comply with the escrow agreement (except the amendment of August 15) and to execute a deed conveying the property to plaintiffs. The purported agreement dated August 15, 1958, (relative to

amending the escrow instructions) is void. The purported amendment to the instructions, executed August 15, 1958 (pursuant to said purported agreement) is void.

Defendant appeals from the judgment. She contends that the evidence does not support certain findings.

The escrow instructions provided that the purchase price was $38,625; that $21,500 of that amount was represented by an encumbrance then on the property; $10,625 was to be represented by a note secured by a second trust deed on the property; $500 had been deposited with the broker and that amount was to be deposited in the escrow; the buyer would deposit $6,000 (balance of purchase price) in the escrow prior to June 15, 1958; the price included carpets, curtains, and draperies. The instructions provided further that the consummation of the escrow was contingent upon "Buyers securing at least a $11,500.00 1st Trust Deed at 6% on her present home"; and that possession of the property would be given at close of escrow.

Mrs. Griffin was unable to obtain the loan referred to in the instructions, prior to June 15. On June 16 Mrs. Griffin and defendant signed an amendment to the instructions, which provided as follows: the escrow holder was authorized to release $500 to defendant; the buyer and seller agreed "to extend the escrow to October 1, 1958"; during the course of the escrow the buyer would pay the monthly installments on the first and second trust deeds which were then of record; and at the close of escrow the buyer would be credited with the amount of principal paid "on the second trust deed."

Prior to May 16, 1958, the defendant employed a real estate broker to sell her property which was located in Pacific Palisades. She was the manager of the broker's office.

Plaintiff Mrs. Griffin testified in substance as follows: On May 16, 1958, the plaintiffs and a salesman from the broker's office went to the property and made a "casual" inspection thereof. Then they went to the broker's office, where the plaintiffs were introduced to defendant. Defendant said she was selling the property because she was planning a trip to Europe. About May 25 the salesman told plaintiffs that defendant would like to have a deposit of $500 if plaintiffs were still interested in the property. They went to the salesman's office on that day and signed a "deposit slip." That slip (Exhibit 2), dated May 25, was in the form of an offer to purchase. An acceptance of the offer (appearing on the

slip) was signed by defendant. She (witness) had no further conversation with defendant until the escrow instructions had been signed—but "probably a day or so before entering escrow" she talked with defendant by telephone. In that conversation she told defendant that "they" had noticed a large crack in the wall and that some doors did not fit well. Defendant replied that the house was in excellent condition, and that she would give the telephone number of the builder to the witness. Thereafter she (witness) telephoned the builder.

On cross-examination, Mrs. Griffin testified: Plaintiffs and Mr. Ziegler went to the house on May 18. Mr. Ziegler had built several houses and "they thought that he might evaluate the construction of the house." They looked at the house carefully, visited every room, and went into the rear yard. She observed that a large crack was in the wall of the living room, that several doors were in a sagging condition and did not fit properly, that there were rust marks where furniture had been placed, and that there was "something wrong" with the floors. Mr. Ziegler told them there was a possibility of abnormal settling, that plaintiffs should "find out" whether the house was on "fill dirt," whether there had been abnormal settling, and what kind of drainage system there was. He also said there were indications that the drainage was not good.

Mr. Griffin testified that on May 24 he, Mrs. Griffin, and the salesman went to the property; he asked defendant about the wall cracks and the doors that did not fit; defendant replied that it was normal settling of the property and was normal in a new house; in their discussion about drainage, the defendant said that the lot drained toward the street and there were underground drains; they discussed the irregularity of the rear lawn; he believed that he asked her if the irregularity had been caused by a slide, and that she replied that there had not been a slide.

Defendant testified in substance as follows (with reference to representations) : When the plaintiffs came to the house on May 18, Mr. Griffin asked whether there had been any trouble with the bank (back of the house). She replied that she had not had any trouble with it. He asked about the drainage. She replied that there was a drainage ditch "up on the level," and that they would not have any trouble with drainage. After the plaintiffs inspected the house they asked about the

cracks in the walls. She replied that she "would say" that those were merely settling cracks, that Mr. Peerless was a good builder, and that they might talk to him. Thereafter she talked with Mrs. Griffin by telephone, and Mrs. Griffin said that she had telephoned the builder and he said that the cracks were settling cracks.

In June, after extending the escrow time to October, the defendant went to Europe. On July 4, Mrs. Griffin (with the consent of defendant) moved into the house. A few days later, while Mr. Griffin was removing weeds and debris from an area in the rear yard, he saw puddles of water there. About July 15, at the request of Mrs. Griffin, grading inspectors of the Department of Building and Safety of the city inspected the property. Mr. Ford, a grading inspector, made a report (dated August 15) which stated that the rear slope, due to supersaturation, slumped into the rear yard, and that if all loose material is removed and "walls installed and back filled as per plan this should correct condition." (The plan is not a part of the record herein.) Plaintiffs caused plans to be drawn for the construction of a retaining wall in the rear yard, and for the construction of facilities for drainage of the property. Commencing in August, they constructed a retaining wall along the side of the property, and constructed retaining walls and a patio in the rear of the property.

Prior to defendant's departure for Europe she executed a general power of attorney whereby she appointed Mr. Erickson her attorney-in-fact. About August 14, Mr. Erickson, the plaintiffs, Mr. Jumper, and Mr. Mulholland (who was defendant's attorney at law) met in Mr. Mulholland's office. Plaintiffs showed to Mr. Mulholland the report of the city inspector and the plans for construction of a retaining wall and other facilities. Mr. Mulholland prepared an agreement regarding the construction of the wall and the closing of the escrow. On August 15 the plaintiffs and Mr. Erickson, as attorney-in-fact for defendant, signed the agreement.

That agreement, so referred to, stated in substance as follows: A dispute had arisen between the parties to the escrow concerning improvements to be made on the property and "in particular an engineered retaining wall in the rear of the premises." The buyer was desirous of "carrying on with" the purchase agreement and desired to proceed immediately with the construction of the retaining wall and would be jeopardized in the event the close of escrow was held up pend-

ing the return of the seller. That the buyer would pay to the seller, through the broker and the escrow, the amount of $5,000 which would include the funds theretofore deposited. That the escrow holder is authorized to release $5,000 to seller. That the balance of $1,500 would be withheld by the buyer. That the buyer agreed to use said funds in connection with the disputed improvements referred to therein. That the buyer's "claim against the Seller is in the amount of $1,500.00, and no more, in connection with this transaction and further agrees that this Agreement in no way commits the Seller to any course of conduct whatsoever insofar as said claim is concerned." That this "Agreement does not in any respect satisfy the agreement of the Buyer to pay the said $1,500.00 to the Seller, nor is it any admission on the part of the Seller of any liability in any regard to the Buyer in connection with the said claim or any other claim . . . but, in respect to said $1,500.00, parties hereto agree that the said obligation to pay the said amount be deferred until 30 days after the return of the Seller." That the escrow holder "be and hereby is directed" to amend the escrow instructions to conform hereto, "but except wherein herein amended, the said Escrow Agreement and instructions to remain in full force and effect."

In a telegram received by the escrow holder on August 18, the defendant stated: "Do not close escrow. Terms not agreeable. Will telephone 10 a. m. P.S.T. Tuesday."

On August 18 or 19 the escrow holder advised Mrs. Griffin of the receipt of the telegram and the contents thereof.

Plaintiffs continued in possession of the property and they made payments on the trust deeds which were of record. As above indicated, they also proceeded with the construction of the retaining walls, patio, and other facilities.

About October 21, 1958, defendant sent a letter to the escrow holder instructing it not to close the escrow. About November 15, 1958, after defendant returned to California, she told plaintiffs that she would not pay the cost of installing the wall. As above stated, Mrs. Griffin sent the notice of rescission on December 4.

Three witnesses, called by plaintiffs and next referred to herein, testified regarding the asserted unsatisfactory condition of the property.

Mr. Reibling, a grading inspector for Los Angeles, testified: He inspected the property about July 15, 1958. There was a

slope in the rear yard of the property. The "toe" or bottom of the slope was about 15 feet from the house. Halfway up the slope there was a drainage terrace. A slope failure in the left rear corner of the property caused a slump which extended from the toe of the slope toward the house for a distance of 7 or 8 feet. In his opinion the slope became supersaturated and failed, and the slumping occurred at least two or three months before he inspected the property.

Mr. Custer testified that he resided in the adjoining property; there was a heavy rain in February 1958; about the first part of April he noticed a cleavage in the slope at the rear of the property; thereafter for approximately 30 days there was a movement of earth into the area back of the house.

Mr. Linsday testified in substance as follows: About March 30, 1958 (approximately 2½ months before the sale), he had a conversation with defendant regarding repair work to be done at the property herein. He went to the property and noticed that there were plaster cracks and "evidence of settlement." Defendant requested him to advise her as to the cost of repairing the property. He sent a letter to defendant wherein he listed the things necessary to correct "the problems" and to prevent further damage. He delivered the letter to a person in defendant's office.

A copy of the letter, so referred to, was received in evidence. The letter stated that the work that would be required for repairs included: Drainage ditch, catch basin, tile drain to street, concrete wall, and leveling structure of house. The estimated cost of repairs, as shown by the report, was $3,405.

Linsday testified further that in June, 1958, defendant said that "she didn't want to do anything but repair the damage that was concealed by furnishings and drapes"; he sent men to do that work; his charge for the work was $42.50, but he was paid $32.50.

With reference to the testimony of Linsday, the defendant testified: In June, 1958, Linsday came to her office and asked her if she ever had occasion to "call in a man to do odd jobs," and he mentioned plastering. She told him there were some cracks in the house referred to herein, and she would have them fixed if it was not too expensive. The following day workmen fixed the cracks and painted the walls. She had not seen Linsday prior to June 1958, and she had not seen the letter of March 30 (referred to above) prior to the week preceding the trial.

The court found as follows: Defendant, for the purpose of inducing plaintiffs to purchase the property, made representations that there was no slide or subsidence of the slope to the rear of the house, that the property had a proper and satisfactory drainage system, that the house and lot were in excellent condition, that there was a minor crack in only one wall in the house, and that the doors had been properly fitted. Those statements were false and were known by defendant to be false at the time they were made. Plaintiffs placed full confidence in defendant and relied on those statements and they would not have agreed to execute the escrow instructions and the amendments thereto had they known the statements were false. By reason of the falsity of the representations made by defendant the property was not worth the price plaintiffs agreed to pay for it. If the plaintiffs had "purchased the whole property as it was represented to them to be, it would not have required the repairs to the drainage system, erection and construction of concrete retaining wall and other damage to the house, floors, doors, foundation, all of which the court finds that it did require due to the faulty drainage condition, subsidence of a portion of the rear bank of the property, and which the court finds had already caused considerable damage to the house in question prior to May 27, 1958 [the date the escrow instructions were signed]." The agreement dated August 15, 1958 (which was signed by plaintiffs and by Mr. Erickson as attorney-in-fact for defendant) and the amendment to the escrow instructions made pursuant thereto were in fact a unilateral agreement, without consideration and were repudiated by defendant before the unilateral agreement was consummated. The agreement of August 15 and said amendment are not binding on plaintiffs. Plaintiffs have elected to "stand on" the escrow agreement and the amendments thereto, except the amendment of August 15, with full knowledge of the fraud and the existing conditions. Plaintiffs have affirmed the contract and are not entitled to its rescission. Plaintiffs have not waived the fraud and they are entitled to recover from defendant such damages as they have sustained as a result of the fraud. Plaintiffs have been damaged by the fraud and misrepresentations, as set forth in the findings, in the sum of $7,565. Plaintiffs are entitled to a conveyance of the property to them subject to the provisions of the escrow agreement and the amendments thereto with the exception of the amendment of August 15; "Provided, however," plaintiffs are entitled to a credit in said sum of $7,565

and costs against the purchase price as set forth in the escrow agreement.

The provisions of the judgment are stated hereinabove.

With reference to plaintiffs' cause of action for rescission, the court found that plaintiffs elected to stand on the purchase agreement, and that they were not entitled to rescind. The evidence supports those findings. There is no contention on appeal regarding the determination of the rescission issue.

As to the cause of action for money had and received, there was no finding or judgment with respect thereto. Apparently that issue was abandoned.

With respect to plaintiffs' alternative claim for damages (in lieu of rescission), the court found that plaintiffs had been damaged in the amount of $7,565. It appears, however, that the provision of the judgment with respect to that amount was qualified by provisions to the effect that said amount should be applied on the purchase price of the property. It thus appears that plaintiffs did not obtain an unqualified judgment for damages in that amount, but did obtain a judgment which in effect reformed the escrow instructions or purchase agreement (by reducing the purchase price to the extent of $7,565) and ordered the parties to specifically perform the agreement as so reformed. Apparently the judgment was in the form of a reformation and specific performance judgment, instead of an unqualified judgment for damages, for the reason the escrow had not been closed and the plaintiffs were not the owners of the property. It is apparent that the credit for $7,565 on the purchase price was allowed on the basis, as found by the court, that plaintiffs were entitled to damages in that amount. Irrespective of other questions that may be involved by reason of the form of the judgment, a question arises as to whether the evidence was sufficient to support the finding that plaintiffs were damaged.

Section 3343 of the Civil Code provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

Said section 3343 "established in California the out-

of-pocket loss rule.'' (*Garrett* v. *Perry*, 53 Cal.2d 178, 183 [346 P.2d 758].)

■ ''The measure of damages thus set forth [Civ. Code, § 3343] is the difference between the consideration paid for the property and the actual value of the property, with additional damage, if any.'' (*Rothstein* v. *Janss Investment Corp.*, 45 Cal.App.2d 64, 73 [113 P.2d 465]; *Crawford* v. *Nastos*, 182 Cal.App.2d 659 [6 Cal.Rptr. 425].)

■ In *Bagdasarian* v. *Gragnon*, 31 Cal.2d 744 [192 P.2d 935], it was said, at pages 762 and 763: ''In view of the broad, general language of section 3343 of the Civil Code and the uncertainty in the law that existed both here and elsewhere prior to the adoption of that section, it is reasonable to conclude that the statute was enacted to provide a uniform rule for all fraud cases, and we can see no reason for refusing to follow the decisions which have applied it as the exclusive measure of damages. Moreover, to hold that an additional or alternative measure may be applied in some cases would create further confusion with respect to when the alternative measure would be appropriate in place of the statutory measure and whether the matter would be one for the judge, as a matter of law, or for the jury.

■ ''The provisions of section 3343 to the effect that the defrauded person may also recover any 'additional damage' arising from the particular transaction and that nothing in the statute shall be deemed to deny to such a person 'any legal or equitable remedies' to which he may be entitled, do not indicate that any other *measure of damages* may be applied. The right to recover *additional* damages does not refer to the *measure* of damages, but, rather, to such matters as expenses or other consequential injury resulting from the fraud. [Citations.] ■ The provision relating to other legal or equitable *remedies* likewise does not pertain to measure of damages, but, rather, it preserves such other remedies as the right to rescind or the right to recover on a warranty, if any.''

■ In the present case the court found, as above stated, that by reason of the misrepresentations the property ''was not worth the price plaintiffs agreed to pay therefor.'' It appears, however, that there was no evidence as to the value of the property, and consequently there was no evidence as to any difference between the consideration paid for the property and the actual value of the property.

The court found, as above stated, that if the property had

been "as it was represented" to be, "it would not have required the repairs to the drainage system," or the construction of the retaining wall, or the repairs to the house. It seems to be the position of respondents (plaintiffs) that such repairs are additional or consequential damages under said section 3343. In *Garrett* v. *Perry*, 53 Cal.2d 178 [346 P.2d 758], it was said, at page 186: "It is generally recognized, under both the benefit-of-the-bargain and the out-of-pocket-loss rules, that when, as a result of the fraud, the person defrauded has made expenditures which were reasonable under the circumstances, these may ordinarily be recovered, insofar as they have been lost or rendered fruitless because of the deceit." In the present case the repairs and construction have not been lost or rendered fruitless, but the repairs and construction constitute improvements of the property. Under the judgment herein, plaintiffs would receive the benefits of such improvements. Apparently the findings herein as to damages were based on the cost of the repairs and construction. In *Central Mutual Ins. Co.* v. *Schmidt*, 152 Cal.App.2d 671 [313 P.2d 132], it was said, at pages 676 and 677: "While cost of repairs has some probative worth on the issue of value, it is not of itself the proper measure of damages."

In *Crawford* v. *Nastos*, 182 Cal.App.2d 659 [6 Cal.Rptr. 425], the plaintiff, as buyer, sought damages for fraud in the sale of a ranch. At the beginning of negotiations therein, the plaintiff told the agent of the sellers that she would not be interested in the property unless there was ample supply of water. The agent replied that a water well on the property supplied sufficient water for the entire acreage. The representation was false, and judgment was rendered against the agent for $1,419.73, the amount spent by plaintiff to put a water well into operation. There was no evidence therein as to the value of the property, and the agent contended on appeal that the absence of such evidence foreclosed the award of damages for repairs to the well. It was held therein that such contention was valid. It was said at pages 669 and 670: "Pursuant to section 3343, Civil Code, a party defrauded in the purchase of real property is entitled to recover damages in the amount of the difference between what he paid for the property and its reasonable value at the time of the purchase [citation]. 'The measure of damages thus set forth (Civ. Code, § 3343) is the difference between the consideration paid for the property and the actual value of the property, with

additional damage, if any' [citation]. In the event of a retrial, there should be an adherence to the 'out-of-pocket loss' rule which is now firmly a part of our decisional law [citation] and the exclusive measure of damages in a case such as this.''

Under the circumstances in the present case, the cost of repairs and construction was not additional damage within the meaning of section 3343 of the Civil Code.

In view of the above conclusion, it is not necessary to determine other contentions on appeal.

The judgment is reversed.

Fourt, J., and Lillie, J., concurred.