Filed 12/12/14  Dhillon v. Tersini CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PARMVIR S. DHILLON et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>LOUIE TERSINI et al.,<br><br>    Defendants and Respondents. | H038447<br>(Santa Clara County<br>Super. Ct. No. 1-09-CV137134)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |

BY THE COURT:

It is ordered that the opinion filed herein on November 21, 2014, be modified as follows:

On page 17, in the second sentence of the disposition, following the word "misrepresentation," insert the words "and concealment," so the second sentence reads, as follows:  "The matter is remanded for retrial only of the misrepresentation and concealment causes of action which were disposed of by respondents' motions for nonsuit, as well as for retrial of the claim for rescission."

Appellants' petition for rehearing is denied.  There is no change in the judgment.


Dated:_____          _____
                                                                                                     Premo, J.




_____          _____
            Rushing, P.J.                                                                    Elia, J.

Filed 11/21/14  Dhillon v. Tersini CA6 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PARMVIR S. DHILLON et al., | H038447 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. 1-09-CV137134) |
| v. | |
| LOUIE TERSINI et al., | |
| Defendants and Respondents. | |

Appellants Parmvir S. Dhillon and Mohinderpal Kaur (the Dhillons)[1] purchased a condominium in a small (20 unit) complex in San Jose in 2007.  After moving into their downstairs unit, the Dhillons began experiencing what they considered excessive noise from the unit upstairs and eventually filed a lawsuit against the sellers, respondents Louie and June Tersini (the Tersinis), as well as the real estate agent, Cindy Riccardi, and the broker, Ryness Company (Ryness).[2]  Eventually, the matter proceeded to trial on the Dhillons' claims of breach of fiduciary duty and fraud.  With respect to their fraud claims, the Dhillons sought damages or, as an alternative remedy, rescission.

After the Dhillons closed their case-in-chief, the Tersinis moved for nonsuit, arguing the Dhillons had failed to present competent evidence of damages recoverable

---

[1] Parmvir and Mohinderpal are married.  Mohinderpal testified she goes by her married name of Dhillon, so we hereafter refer to them as the Dhillons for simplicity's sake.

[2] We refer to the Tersinis, Riccardi and Ryness collectively as "respondents."

under Civil Code section 3343.[3]  Riccardi and Ryness brought a separate motion for nonsuit, arguing the Dhillons had failed to present evidence to support the existence of a fiduciary relationship between themselves and Riccardi and Ryness.  The trial court granted both motions, dismissed the jury and proceeded to a court trial on the Dhillons' claim for rescission.

Following the court trial, the trial court issued a statement of decision in which it found the Dhillons had failed to establish fraud, either by misrepresentation or concealment, and were thus not entitled to rescission.  Judgment was entered in favor of respondents.

On appeal, the Dhillons argue:  (1) the trial court erred in granting Riccardi's and Ryness' motion in limine precluding any evidence relating to an agency relationship between Riccardi and the Dhillons, which error necessarily led to the court's granting Riccardi's and Ryness' subsequent motion for nonsuit; (2) the trial court erred in granting the Tersinis' motion for nonsuit as there was sufficient evidence of damages resulting from respondents' misrepresentations and concealment; (3) the trial court erred in finding in respondents' favor on the concealment cause of action because the court improperly dismissed the jury without allowing it to determine whether or not fraud had occurred; and (4) alternatively, the trial court applied the wrong legal standard regarding concealment.

We agree that the trial court erred in granting the motion for nonsuit on the misrepresentation claims, but not on the fiduciary duty cause of action.  Because we will reverse and remand for retrial on those misrepresentation claims, the trial court's decision on the rescission claim must be vacated and that issue must also be retried by the court.

---

[3] Further statutory references are to the Civil Code.

2

# I.     FACTUAL AND PROCEDURAL BACKGROUND

Between 1989 and 1991, the Tersinis built a 20-unit complex, now known as Century Plaza Condominiums (Century Plaza), on a one-acre parcel on Moorpark Avenue in San Jose, California. Century Plaza consists of four separate two-story buildings with individual units on each floor. The units were constructed with sound attenuation features including concrete flooring in the upstairs units, along with resilient channel ceilings.

Upon completion, the units were initially rented out as apartments. As rentals, the units had tile flooring in the entryways, and linoleum flooring in the kitchens and bathrooms. The living room, dining room and bedrooms were all carpeted.

In 2006, the Tersinis decided to sell the units as condominiums and terminated the existing leases. All of the units were renovated and the linoleum flooring in the kitchens and bathrooms was replaced with tile. Prospective purchasers were offered a range of upgraded carpeting or hardwood flooring in the living room, dining room and bedrooms.

In February 2007, the Dhillons stopped by Century Plaza and met with Riccardi, a licensed real estate agent.[4] After viewing several units, they asked Riccardi if she would recommend a unit for them to buy. She suggested they might prefer unit No. 3 (a downstairs unit) as it was more private and would be quieter than other available units, two of which were adjacent to a daycare center. At some point during their initial meeting, Riccardi gave the Dhillons a business card which indicated she was a sales representative for Century Plaza.

As they toured the property, Riccardi told the Dhillons about the renovations. She said there was "solid concrete" between the upper and lower units. The sales brochure she gave the Dhillons noted that, among various "energy conservation and sound

---

[4] Riccardi's license was lodged with Ryness, the brokerage company retained by the Tersinis to market and sell the units at Century Plaza.

3

attenuation features" in the units, there was a "concrete floor" in the upper units and "resilient channel ceiling" in the lower units.

At a second meeting with Riccardi at Century Plaza, the Dhillons asked if they would have noise problems in a downstairs unit, but Riccardi reassured them they would not because of the concrete floor between the units. Riccardi said that many units in the complex had already been sold and there had been no complaints about noise.

The Dhillons then knocked on the door of several units in the complex, and spoke to two couples (one in unit No. 7 and another in unit No. 5). Both of those couples confirmed that Century Plaza was a quiet community and they had no complaints about noise from the upstairs units.[5]

The Dhillons decided to purchase unit No. 3 and Riccardi provided them with a stack of documents to review prior to signing, including a real estate purchase agreement, a property disclosure statement and an agency disclosure. The Dhillons admitted reading through all of these documents before meeting with Riccardi to sign them.

On March 25 (or March 26),[6] 2007, the Dhillons signed the real estate purchase agreement, entering into a contract to purchase unit No. 3 for $459,950. They also executed the property disclosure statement and the agency disclosure on the same date. The property disclosure statement included the following paragraph under the heading "Statements and Agreements by Salesperson": "Seller is not responsible for or bound by any verbal statement or representation made by a salesperson unless the President or Vice President of the Division confirms such statement in writing. If any such verbal representation or statement has been made, please put it in writing in the space provided

---

[5] The Dhillons subsequently learned that, at the time they made these inquiries, their prospective neighbors' upstairs units were vacant.

[6] The Dhillons testified that although they signed the contract on March 26, 2007, but that Riccardi directed them to backdate the document to March 25, because "that's the last day the buyers [*sic*] can allow her to sell that unit."

below and initial along with the salesperson in the blank provided below." Nothing was written in the space underneath that paragraph, although the Dhillons and Riccardi each initialed it.

The agency disclosure contained a section entitled "Confirmation Real Estate Agency Relationships," which indicated that Ryness was the listing and selling agent exclusively for the sellers, rather than for both the buyers and the sellers. Again, the Dhillons signed this document, acknowledging its receipt.

Escrow closed on June 18, 2007, but the Dhillons did not move in until July 1, 2007. Several weeks later, they began hearing an excessive amount of noise from the unit above them (unit No. 4). Initially, they believed that someone had just moved into the unit and the noise was due to moving things around, but as the noise continued over the next few weeks, they realized that was not the case.

Specifically, the Dhillons were able to hear the following sounds from the upstairs unit: kitchen counter noises, such as chopping; footsteps; male urination; flushing toilets; bedsprings; chairs scraping across the floor; cords hitting the wall; alarm clocks; the television; bedroom noises; talking; music; creaking floor; drawers opening and closing; the washing machine; blenders; noises from the master bedroom vanity; etc.

On August 13, 2007, the Dhillons noticed a crowd of people meeting around the Century Plaza pool. Jeanne Anderson, the Tersinis' property manager, was present along with several other residents. When the Dhillons approached, they discovered the meeting was about the noise problems all these residents were experiencing, and they were invited to voice their complaints as well. This was the first time the Dhillons heard that other neighbors had been experiencing noise problems in their units.

The Dhillons would often leave their home in order to avoid the noise, and it interfered with their sleep, as well as their young childrens' sleep. Because they could not afford both a mortgage and a rent payment, they have not moved. In addition, the Dhillons were unsuccessful in their efforts to rent their unit after disclosing the noise

5

issues. Two separate prospective renters visited unit No. 3 in order to hear the noise first-hand. Neither of them contacted the Dhillons again.

In 2009, Mohinderpal took their two children with her to Hong Kong for several months to escape the noise and the headaches it was causing her. She spent approximately $3,000 on airfare for that trip.

The Dhillons filed a complaint against the Tersinis, Riccardi and Ryness, listing causes of action for negligent misrepresentation, intentional misrepresentation, concealment, violation of sections 1102 et seq., breach of fiduciary duty, negligent infliction of emotional distress and intentional infliction of emotional distress. In their complaint, the Dhillons alleged that the respondents falsely represented, both orally and in writing, that they would hear little to no sound from the upstairs unit because of the solid concrete barrier between their unit and the upstairs unit, as well as the other noise attenuation features. In addition, the Dhillons alleged that the respondents, prior to the close of escrow on unit No. 3, were aware of noise complaints from the owners of other downstairs units. The Dhillons sought rescission, or in the alternative, damages.

At trial, the Dhillons called other owners of downstairs units to testify about the representations made to them during the sales process. Soo Kim, who purchased unit No. 11, testified she was told there was solid concrete between upstairs and downstairs units and that the concrete was thicker than normal to absorb the sound. Jennifer Moss and her husband, who purchased unit No. 13, were also told by Riccardi that there was solid concrete between the units.

On March 29, 2007, Mark Lubeck, owner of unit No. 5, telephoned Anderson to complain about excessive noise from the unit above his. He followed up with e-mails to her on April 1[7] and April 7. In his April 7 e-mail, Lubeck wrote that other owners of downstairs units were having similar issues with upstairs units in which hardwood

---

[7] Riccardi was copied on the April 1 e-mail.

6

flooring had been installed. In an April 16, 2007 e-mail from Anderson to Riccardi, Anderson wrote that Lubeck has "spear-headed a complaint campaign" regarding the "flooring." Riccardi responded, "As far as the flooring thing ……. What flooring thing??????????? (ha, ha)." Anderson replied, "Don't have the faintest idea what you are talking about… ;-)" In May 2007, the owners of unit No. 9, Wilson and Margaret Craig, complained to Anderson about the noise emanating from the unit upstairs.

The Dhillons also presented evidence to show the Tersinis hired an attorney and an acoustical engineer in April 2007 because of the noise issues raised by Lubeck. Before escrow closed on unit No. 3, respondents learned that the newly-installed tile in upstairs bathrooms, vanity areas and kitchens had been installed improperly and the noise transmission levels violated the minimum standard set forth in the building code.

After the Dhillons rested their case, the Tersinis brought a motion for nonsuit on the grounds that there was no evidence of recoverable damages. This motion was joined by Riccardi and Ryness, who brought a separate motion for nonsuit as to the breach of fiduciary duty cause of action based on the Dhillons' failure to present evidence supporting the existence of such a duty.

The trial court granted the motions, and proceeded to the court trial on the Dhillons' claim for rescission. After the parties proceeded by way of offers of proof, the trial court issued a statement of decision in which it found that the Dhillons had failed to prove misrepresentation or concealment by defendants or present evidence that the value of their unit was affected by the noise transmissions. Judgment was subsequently entered against the Dhillons.

## II.    DISCUSSION

### A.    *Nonsuit in favor of Riccardi and Ryness*

The Dhillons argue the trial court erred first by granting Riccardi's and Ryness' in limine motion precluding them from introducing contemporaneous statements regarding Riccardi's agency to the extent those statements contradicted the agency disclosure

statement.  Because the Dhillons were not allowed to introduce any evidence to show that Riccardi was a dual agent and thus owed them fiduciary duties, the trial court granted the motion for nonsuit on the cause of action for breach of fiduciary duty.  We find no error.

### 1.    The in limine motion and motion for nonsuit

Before trial, Riccardi and Ryness brought a motion in limine to exclude evidence of conversations between Riccardi and the Dhillons regarding her status as a dual agent, arguing such evidence was precluded by the parol evidence rule.  The Dhillons initialed and signed the agency disclosure statement which explicitly provided that Riccardi was acting exclusively as the sellers' agent, not as an agent for the buyers and sellers.

In response, the Dhillons argued the agency disclosure form was not a fully integrated agreement and thus not subject to the parol evidence rule.  As an offer of proof, the Dhillons indicated they would testify that when they were signing the purchase documents, Riccardi told them they would not need their own agent because they would have to pay that agent themselves.  She then directed their attention to the language in the agency disclosure discussing an agent representing both the buyer and the seller.

The trial court granted Riccardi's motion and excluded testimony regarding any statements made contemporaneous with the execution of the agency disclosure form since the language in that written document was a complete and exclusive statement of their agreement that Riccardi was acting only as the sellers' agent in the transaction.  The trial court stated it would not permit any "extrinsic evidence as to the document, but there can be evidence as to whether or not separate and apart from that document an agency was created."  At trial when the subject came up again, the trial court reiterated "there was no extrinsic evidence that would be admissible to talk about the terms, because there was no ambiguity.  But there could be facts separate and apart which could--facts separate and apart from the disclosure form.  If that established an agency, then those facts would be admissible."

At trial, once the Dhillons rested their case, Riccardi and Ryness moved for nonsuit on the Dhillons' breach of fiduciary duty cause of action, arguing no evidence had been presented to establish that Riccardi owed them any such duty. The Dhillons sought to reopen and made an offer of proof that they would testify they had a friend who would refer them to an agent, but Riccardi advised them they did not need an agent, saying she represented all of the other buyers in the complex. She also told them they would have to pay an agent "out of [their] own pocket." The trial court granted the motion.

### 2. *Applicable legal principles*

#### a. *Motion for nonsuit*

A motion for nonsuit "is tantamount to a demurrer to the evidence [citations] by which a defendant can test the sufficiency of the plaintiff's case before presenting his or her own." (*Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 272; Code Civ. Proc., § 581c, subd. (a).) In ruling upon the motion, the trial court examines the evidence without weighing it or considering the credibility of witnesses, accepting as true the evidence most favorable to the plaintiff, indulging in every legitimate inference drawn from the evidence in the plaintiff's favor and disregarding conflicting evidence. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838.) The trial court may grant the motion only if there is no substantial evidence to support an element of the claim; the court is bound to deny a nonsuit motion if the evidence would support a jury verdict in the plaintiff's favor. (*Ibid.*)

In reviewing the trial court's ruling, we review the entire record, applying the same rules that governed the trial court's determination. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1327.) " 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of

law.' " (*Carson v. Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.)  Thus, our task is to examine the evidence presented by the Dhillons to determine whether it was sufficient to support a jury finding that Riccardi owed a fiduciary duty to them.

> b.      *Review of in limine orders and the parol evidence rule*

We review a trial court's ruling on a motion in limine for abuse of discretion. (*People v. Mincey* (1992) 2 Cal.4th 408, 439.)

"[The parol evidence rule] provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing.  [Citation.]  'An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.' " (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174, fn. omitted.) Accordingly, "[w]hen the parties to a written contract have agreed to it as an 'integration'--a complete and final embodiment of the terms of an agreement--parol evidence cannot be used to add to or vary its terms." (*Masterson v. Sine* (1968) 68 Cal.2d 222, 225.)

"Unlike traditional rules of evidence, the parol evidence rule 'does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission.  The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the "integration"), *becomes the contract of the parties*.  The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement.' " (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344.)  "The parol evidence rule therefore establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements.  In doing so, the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement." (*Ibid.*)

"In this state, . . . the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38 (*Pacific Gas*), fn. omitted.) "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose." (*Id.* at p. 39.)

*Pacific Gas* made clear that the traditional rule that parol evidence is inadmissible to contradict the "plain meaning" of an integrated agreement does not apply in California. "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] [¶] A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." (*Pacific Gas*, *supra*, 69 Cal.2d at p. 37.) Thus, "[a]n ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence." (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360.) "In order to determine initially whether the terms of *any written instrument* are clear, definite and free from ambiguity the court must examine the instrument in the light of the circumstances surrounding its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous." (*Estate of Russell* (1968) 69 Cal.2d 200, 208-209.)

"[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. [Citations.] Such

evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is 'fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (*Pacific Gas*, *supra*, 69 Cal.2d at pp. 39-40, fn. omitted.)

### 3. *Analysis*

The trial court properly granted the motion in limine. The agency disclosure statement, which the Dhillons admitted reading and signing, made clear that Riccardi was acting as the exclusive agent of the sellers. While this document is not a contract in the traditional sense, it is a written expression of the parties' understanding regarding the agent's role in the real estate transaction. By executing the statement, the Dhillons acknowledged that Riccardi was *not* their agent and undertook no extraordinary duties to them. The Dhillons' testimony that Riccardi told them they did not need their own agent, and that Riccardi was acting as the agent for all the buyers in the complex, directly contradicts the acknowledgement they signed. Permitting them to offer this evidence would render the disclosure statement meaningless. Besides, the trial court made clear that its ruling only precluded the Dhillons from testifying about the contemporaneous statements Riccardi made at the time the disclosure was signed. They remained free to offer other evidence demonstrating how Riccardi may have assumed a fiduciary duty to them. It was only after they failed to present any such evidence in their case-in-chief or in their offer of proof that the trial court granted Riccardi and Ryness' motion for nonsuit.

Turning to that motion for nonsuit, it is clear that the Dhillons failed to present substantial evidence to support the existence of a fiduciary duty owed to them by Riccardi. Though the in limine motion did not permit them to testify that Riccardi told

12

them she was acting as the buyers' agent at the complex, they were expressly permitted to offer other evidence showing that Riccardi undertook a fiduciary relationship with them. Their failure to present any such evidence was fatal to that cause of action.

Accordingly, the trial court properly entered nonsuit in favor of Riccardi and Ryness on the breach of fiduciary duty cause of action.

### B. *The Tersinis' motion for nonsuit*

#### 1. *Applicable legal principles*

Section 3343 provides that the out-of-pocket measure of damages applies in the case of fraud in the "purchase, sale or exchange of property." (§ 3343, subd. (a).) Section 3343, subdivision (a), provides, "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction . . . ." This statute has been held to define the exclusive measure of damages for most forms of fraud in connection with the sale of property. (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 762-763; *Cory v. Villa Properties* (1986) 180 Cal.App.3d 592, 599.) It authorizes recovery for so-called " 'out-of-pocket' " loss (*McNeill v. Bredberg* (1961) 192 Cal.App.2d 458, 467-468), i.e., " 'the difference between the consideration paid for the property and the actual value of the property, with additional damage, if any.' " (*Id.* at p. 468.) It does not permit recovery of "benefit of the bargain" damages, which represent the harm to the plaintiff's " 'expectancy interest,' " and are measured by the difference between the value received and the value promised (or more precisely, the value the plaintiff was led to expect). (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 (*Alliance Mortgage*), quoting *Stout v. Turney* (1978) 22 Cal.3d 718, 725.)

In sum, one who misrepresents the condition of property in order to persuade another to buy it may not generally be held liable for the difference between the value of the property as delivered and its value as described, but only for the difference between

the value of the property as delivered and the price actually paid. This means that if the property is found to be worth what the plaintiff paid for it, he will be able to recover only such "additional" damages as he can establish. (§ 3343, subd. (a).)

In *Gagne v. Bertran* (1954) 43 Cal.2d 481, the plaintiffs purchased property based upon the defendant's report that there was no fill below 16 inches. When the plaintiffs commenced construction of a foundation for an apartment building they discovered that the fill actually went as deep as six feet in some places. (*Id*. at p. 485.) The plaintiffs sued the defendant to recover the increased cost of installing the foundation. (*Ibid*.) The Supreme Court stressed that the proper measure of damages was the difference between the true value of the property and the amount plaintiffs had paid for the lots. (*Id*. at pp. 490-491.) "[I]f the lots were worth what plaintiffs paid for them, plaintiffs were not damaged by their purchase, for even though they would not have bought the lots had they known the truth, they nevertheless received property as valuable as that with which they parted." (*Id*. at p. 491.)

In addition to out-of-pocket losses, one defrauded in the purchase of real estate is entitled to recover "any additional damage arising from the particular transaction, including . . . [a]mounts actually and reasonably expended in reliance on the fraud," and "[a]n amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud." (§ 3343, subd. (a)(1), (2).) These "additional damages" may be recovered even without evidence of a difference in value, so long as the plaintiff can show the expenses were directly related to defendants' fraud or concealment. (*Stout v. Turney*, *supra*, 22 Cal.3d at pp. 729-730; *Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1241, fn. 5.)

2.     *Evidence of damages regarding out-of-pocket loss*

As appellants, the burden of proof is on the Dhillons to show they presented substantial evidence to support their claims for out-of-pocket loss. They have not done so.

14

The evidence presented on this subject by their acoustical expert was that the units at Century Plaza were constructed to the lower standards used for apartments, rather than high end condominiums. No evidence was presented as to what effect those lower standards would have on the price of the units, however, and the Dhillons made no attempt to establish a lower value with any competent evidence. Instead, their theory of out-of-pocket damages assumed that the property was worth nothing to them. They testified that, had they known that they would experience the amount of noise from the upstairs unit, they would not have purchased unit No. 3. While that may be true, it does not mean that unit No. 3 had *no* value whatsoever. The Dhillons had a roof over their heads, a place to store and prepare their meals and a place to sleep, whether that sleep was fitful or not. Had they not purchased unit No. 3, they would have had to pay rent or a mortgage for a different property. There was no evidence offered on the subject of what a comparably-constructed dwelling was worth, in that general area, during that time frame. If the Dhillons had been able to prove that the property's actual value in 2007 was some specified amount less than what they paid ($459,950), they would have been entitled to recover the difference. Their failure of proof means the court had no evidence upon which it could base an award for the difference in value. Consequently, the court was justified in finding that the Dhillons' evidence on out-of-pocket damages was insufficient to go to a jury.

### 3. *Evidence of additional damages*

However, after (properly) finding that the Dhillons had failed to present evidence to support their claim for out-of-pocket damages, the trial court improperly found that the Dhillons could not proffer evidence of additional damages. This was error.

Under *Stout v. Turney*, it is clear that, even where a plaintiff cannot show a difference in value between what was paid for the property and what was received, additional damages may be recovered, so long as those damages can be directly tied to the defendants' wrongdoing. (*Stout v. Turney*, *supra*, 22 Cal.3d at pp. 729-730.)

15

"[W]hen, as a result of the fraud, the person defrauded has made expenditures which were reasonable under the circumstances, these may ordinarily be recovered, insofar as they have been lost or rendered fruitless because of the deceit." (*Garrett v. Perry* (1959) 53 Cal.2d 178, 186.)  For example, consequential damages would be proper where "a buyer was obliged to move from the property that he had been fraudulently induced to purchase on account of the dangerous character of the premises." (*Jacobs v. Levin* (1943) 58 Cal.App.2d Supp. 913, 917.)  "In such a case he could not only recover the difference between the amount that he had paid for the property and its actual value but also recover the expense of moving." (*Ibid.*)

In *Walters v. Marler* (1978) 83 Cal.App.3d 1, 26-27 (disapproved on other grounds in *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507), the plaintiff purchased property based on representations regarding its boundaries.  He subsequently discovered that only a small portion of a house was actually located on the parcel purchased. (*Walters v. Marler, supra*, at pp. 13-15.)  The appellate court rejected the plaintiff's claim of damages for the cost of landscaping, property taxes, title insurance, property insurance, interest on the loan, and maintenance and repair of the property because those expenditures "would have been made even if the property had been as it was represented to be." (*Id.* at p. 26.)

Here, the Dhillons' evidence of additional damages consisted of the following: escrow fees; $10,000 in points on their mortgage; closing costs; $5,000 deposit; a $60,000 down payment; $3,000 in airfare to Hong Kong and rent while she was in Hong Kong.  While the majority of these expenses are costs they would have incurred in owning any property, such as closing costs, the down payment, etc., there are at least some expenses which may or may not have been incurred because the unit was excessively noisy contrary to what had been represented to them.  Consequently, there was substantial evidence of additional damages that should have been permitted to go to the jury, and thus the motion for nonsuit should have been denied.

16

*C.     Rescission*

The Dhillons argue that, after granting the respondents' motions for nonsuit on the grounds of insufficient evidence of damages, the trial court applied an incorrect standard for evaluating their concealment claim in ruling on their entitlement to rescission.

Because we have determined the trial court erred in granting nonsuit on the Dhillons' misrepresentation claims and are remanding the matter for retrial, which may result in a jury finding that respondents are liable on those claims, the trial court's decision on the rescission claim must also be vacated. Assuming the jury finds actionable misrepresentations were made by respondents resulting in recoverable damages, the trial court should then reexamine whether or not the Dhillons are entitled to rescission as an alternate remedy based on those misrepresentations.

## III.     DISPOSITION

The judgment is reversed. The matter is remanded for retrial only of the misrepresentation causes of action which were disposed of by respondents' motions for nonsuit, as well as for retrial of the claim for rescission.

The Dhillons shall recover their costs on appeal.

_____
                    Premo, J.

WE CONCUR:


_____
      Rushing, P.J.



_____
      Elia, J.